UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

JOHN W. FERRELL,                              )
                                              )
       Plaintiff,                        )
                                              )
v.                                            )    No. 4:09-cv-40
                                              )    *Lee*
MELVIN N. JOHNSON, President,                 )
CHARLES MANNING, Chancellor, and the          )
BOARD OF REGENTS for the                      )
TENNESSEE STATE UNIVERSITY,                   )
                                              )
       Defendants.                       )

## **MEMORANDUM AND ORDER**

This is a case brought by a white employee of an historically black university alleging that employees of a non-historically black university, performing the same job under a single, state-wide agricultural extension program, are paid more highly than he is. Pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, Plaintiff claims he has suffered discrimination because of race. Before the Court is Defendants' motion for summary judgment [Doc. 21], which argues chiefly that Plaintiff is not a member of a protected class and that Plaintiff's salary and benefits were calculated using a legitimate, nondiscriminatory method.[1] For the reasons explained below, Defendants' motion will be **GRANTED** and this case will be **DISMISSED WITH PREJUDICE**.

## **I.    BACKGROUND**

Plaintiff, a white male, is employed as a "Level III" agricultural extension agent in Franklin County, Tennessee, by Defendant Tennessee State University ("TSU") [Doc. 22 at 4; Doc. 40 at 1-2].

---

[1] Defendants have also filed a motion to exceed the page limit specified by the Court's local rules [Doc. 20]. Plaintiff did not respond to the motion and consequently waived any opposition to the motion. *See* E.D. Tenn. LR 7.2.

Defendant Tennessee Board of Regents ("TBR") is TSU's governing body [Doc. 1 at ¶ 4; Doc. 7 at ¶ 4].[2] County extension agents, like Plaintiff, provide outreach services to the farmers within their counties [Doc. 41-1 at 12]. County agents may be employed either by TSU or the University of Tennessee ("UT"): TSU's agricultural extension program is known as the Cooperative Extension Program ("CEP") [Doc. 41 at ¶ 37], and UT's program is known as UT Extension [Doc. 41 at ¶ 57]. CEP and UT Extension have slightly different goals: CEP "primarily" serves "limited resource and minority" farmers, while UT Extension serves all farmers [Doc. 41 at ¶ 64].[3]

TSU is a historically black university; UT is not [Doc. 40 at 2; Doc. 41 at ¶ 3]. Because of its history as a black university, Plaintiff alleges, TSU's agricultural extension agents are "systematically" paid less than UT's for the "same" work [Doc. 1 at ¶ 12; Doc. 27-1 at 15; Doc. 27-8]. Clyde Eugene Chesney, Ph.D., former CEP Administrator, testified in his deposition that CEP employees are indeed paid less than UT Extension employees working in the same offices and with the same qualifications and expertise, but he did not know whether the disparity was racially motivated: "I would say it wasn't necessarily race, per se, but I think it was against the Extension system." [Doc. 27-13 at 8; Doc. 41-1 at 17].

Both CEP and UT Extension maintain separate human resources ("HR") departments and personnel, and their schools of agriculture maintain separate accounting departments [Doc. 41 at

---

[2] Plaintiff also named Melvin N. Johnson, President of Tennessee State University ("TSU"), and Charles Manning, Chancellor for TSU, as Defendants, but Plaintiff has since clarified that he is not alleging personal liability against those Defendants, and they are named only as agents of TSU and its Board of Regents. Accordingly, Defendants' motion for summary judgment is **GRANTED** with respect to the matter of individual liability for Defendants Melvin N. Johnson and Charles Manning.

[3] Plaintiff agrees that these are the "primary" focuses of the programs, but points out that both programs work with all persons requesting assistance [Doc. 27-16 at 6; Doc. 41 at ¶ 64].

2

¶¶ 31, 62]. They also maintain separate operating budgets [Doc. 41 at ¶ 61]. To fund their budgets, the programs receive funding from various sources, including the state of Tennessee, and the United States Department of Agriculture ("USDA") [Doc. 41 at ¶ 59, 60]. In order to receive USDA funding, a state with more than one land grant university must submit a "single work plan" [Doc. 41 at ¶ 59]. To that end, TSU and UT have entered into a Memorandum of Understanding ("MOU") to create a "single, comprehensive State program" and "to outline the procedures for mutual cooperation between the UT Extension and the [CEP]." [Doc. 27-14 at 1; Doc. 41 at ¶ 59]. Dr. Chesney testified that the MOU creates a "new entity," with TSU and UT sharing joint authority [Doc. 40-2 at 6, 14].

Under the MOU, the Administrator of CEP and the Dean of UT Extension serve as "co-executives" of the "Tennessee Extension System" [Doc. 27-14 at ¶ 1]. Plaintiff testified at his deposition that the MOU creates "one extension program with two prongs"—UT Extension and CEP [Doc. 27-1 at 14]. According to Plaintiff, there is "one pot of money" that comes from the federal government to the two universities "to do one program" [Doc. 27-1 at 14]. Plaintiff does not dispute, however, that both state and USDA funds are awarded to CEP and UT Extension separately, not directly to a joint extension program [Doc. 41 at ¶¶ 36, 60; *see also* Doc. 26 at ¶¶ 2, 5; Doc. 27-17 at 6-7, 11]. The universities' separate programs "c[ome] together . . . at the county level," where work planning and program budgeting is done [Doc. 27-14 at ¶¶ 6, 7; Doc. 40-2 at 6]. According to James Stewart, regional director for the central region and an employee of UT Extension, each county's work program is funded by the county government, TSU, and UT [Doc. 27-16 at 2, 6, 10]. For example, each entity—UT, TSU, and the county itself—has a budget that includes a "line item" for supplies for the county's extension program for the year, and those three allotments together

3

furnish the county program's supplies for that year [Doc. 27-16 at 10; Doc. 40-2 at 12]. Dr. Chesney testified in his deposition that extension agents, whether employed by CEP or UT Extension, try to maximize the use of their resources for the benefit of their clientele—the farmers in their counties [Doc. 40-2 at 12].

Each county develops an annual budget for that county's work, which must be approved by the Administrator of CEP and the Dean of UT Extension [Doc. 27-14 at ¶ 7]. According to Dr. Chesney, the county director develops a work plan which allocates the funds received from all the various sources, and the agricultural extension agents therefore perform work that is funded in part by UT and in part by TSU [Doc. 27-13 at 7]. When county funding is cut, the MOU states that those cuts "will be shared equally by the staff of both universities" [Doc. 27-14 at ¶ 9]. Plaintiff explained that he understood that if CEP or UT Extension lost a position due to a funding shortfall from state or county sources, the other university was also required to cut a position, although this requirement was not followed in practice [Doc. 27-1 at 7, 15]. In addition, the MOU memorializes the agreement of the two universities to share computer and software costs [Doc. 27-14 at ¶ 2]. Otherwise, supplies and equipment for CEP and UT Extension staff are provided by their respective universities, and shared supply costs are negotiated as necessary [Doc. 27-14 at ¶ 11].

Work within a county is "collaborative" between the schools [Doc. 27-14 at ¶ 14]. TSU states that it "plans to continue working with [UT] in mutually agreed upon counties." [Doc. 27-14 at ¶ 18]. The MOU recognizes that both UT Extension and CEP employees may work together within a single county; i.e., CEP agents and UT Extension agents may be "co-located" [Doc. 27-14 at ¶ 3]. In those counties, both CEP and UT Extension employees are eligible for county leadership positions, and the "employing university" is responsible for paying any salary increase that comes

4

with such an appointment [Doc. 27-14 at ¶ 3]. The county director is selected "purely based on who is the most qualified to be the county director in that county." [Doc. 41-2 at 2]. The county director for each county supervises both the CEP and UT Extension employees within that county [Doc. 27-14 at ¶ 5], and the county directors are in turn supervised by district, or regional, directors [Doc. 40-2 at 6]. Plaintiff avers that his supervisors, the county and regional directors for his area, are both UT employees [Doc. 40-1 at ¶ 5].

TSU and UT each have the ultimate authority to hire and fire their respective employees. Plaintiff was hired by TSU on the recommendation of a search committee which may have included non-TSU employees [Doc. 27-17 at 3]. Plaintiff acknowledged in his deposition that UT Extension lacked the authority to fire him [Doc. 27-1 at 6-7]. TSU and UT are "different employers," such that an applicant can become a UT extension agent only by applying to UT [Doc. 41 at ¶ 30].[4] In fact, Plaintiff once applied to UT Extension, but he was not hired [Doc. 41 at ¶ 5]. The parties do not dispute that Plaintiff is an employee of CEP, not UT Extension [Doc. 41 at ¶ 66]. Although UT Extension does not have the unilateral authority to make employment decisions affecting CEP employees without the consent of a TSU administrator, Dr. Chesney testified in his deposition that Plaintiff is a "joint" employee of TSU, UT, and Franklin County [Doc. 27-13 at 7; Doc. 40-2 at 8-11]. According to Dr. Chesney, Plaintiff has an "obligation" to those three entities "because it's a joint effort." [Doc. 27-13 at 7]. Dr. Chesney testified that under the MOU, there is "one plan of work [and] one reporting system [Doc. 40-2 at 6].

---

[4] "To further the development of the "combined state Extension program," the MOU provides for the creation of "joint Extension specialist positions" to be funded "by agreement of [TSU] and [UT]" [Doc. 27-14 at ¶ 19]. In practice, there are two individuals who are jointly employed by UT Extension and CEP, but they are employed under separate contracts, with both UT Extension and CEP contributing to their salaries [Doc. 41 at ¶ 67].

5

Plaintiff avers that promotions are approved or disapproved by a "district committee" consisting of Level III extension agents from both CEP and UT Extension [Doc. 40-1 at ¶ 3]. According to Dr. Chesney, a UT Extension employee acting as county director can evaluate CEP employees and can document unsatisfactory performance over a period of time [Doc. 40-2 at 8-11]. Plaintiff testified in his deposition that he had always been evaluated by the county director or the program leader for agriculture, which, as noted above, are both UT Extension employees [Doc. 27-1 at 5]. Dr. Chesney stated that if there was a "problem with performance," the Administrator of CEP and UT Extension's Dean would "probably" review the employee's performance together [Doc. 40-2 at 11]. According to Tim Cross, the Dean of UT Extension, "Regional Directors and County Directors who are UT Extension employees can supervise and evaluate both UT Extension agents and CEP agents," but only TSU personnel can promote, reprimand, discipline, or terminate CEP employees [Doc. 26 at ¶ 11].[5]

As noted above, Plaintiff's allegations are premised on TSU's failure to pay him a salary equal to that received by his UT Extension counterparts. Plaintiff testified in his deposition that he believed the MOU required that he be paid the same salary as UT Extension agents [Doc. 27-1 at 10-11; Doc. 41 at ¶ 4]. Plaintiff acknowledged, however, that his pay checks and benefits come from TSU, not from UT Extension [Doc. 27-1 at 7-8]. When Plaintiff claims reimbursements for travel or requests leave, he completes TSU paperwork [Doc. 41 at ¶ 8]. It is undisputed that UT Extension does not contribute to Plaintiff's salary or benefits in any way [Doc. 41 at ¶ 66]. TSU and UT each

---

[5] Chandra Reddy, Ph.D., the Administrator of Extension at TSU, similarly testified that the terms of the MOU do not permit any UT employee "to promote, relocate, reprimand or terminate any CEP employee," although "TSU and UT administrators work in concert with County Agricultural Committees in matters relating to hiring, relocating, promoting, or terminating extension agents belonging to either of the two organizations." [Doc. 24 at ¶¶ 2, 10].

have the authority to set their own employees' salaries [Doc. 41 at ¶ 45]. TSU is not required to set CEP employees' salaries to match the salaries of UT Extension employees,[6] and, in fact, TSU did not consider UT employees' salaries when setting its own salaries [Doc. 24 at ¶ 11; Doc. 41 at ¶¶ 53, 55, 56].

Instead, TSU set Plaintiff's current salary based on a market analysis study conducted by a private consulting firm in 2006 [Doc. 41 at ¶¶ 46, 51]. That study compared TSU's salaries to market rates with the goal of "reestablish[ing] market parity." [Doc. 41 at ¶ 47]. The methodology of the study was based on a calculation called "position in range" or "PIR," which expresses an individual's actual salary as a percentage of the difference between the minimum and maximum in a range of market salaries [Doc. 41 at ¶ 49]. In other words, where an individual's salary has a PIR of 50%, it is located at the midpoint of the market range [Doc. 41 at ¶ 49]. Based on the study, TSU set new pay ranges for each category of employees, including Plaintiff's category, which went into effect in January 2007 [Doc. 41 at ¶ 51]. The midpoint for each of the new pay grades was set at the market midpoint [Doc. 41 at ¶¶ 49, 52]. All salaries below the minimum of these new pay ranges were brought up to the new minimums, and salaries in the bottom 20% of the new ranges were increased by 2% [Doc. 41 at ¶ 51]. The pay adjustments are ongoing; pay structures are reviewed each year, and all TSU employees are expected to reach the midpoint of their pay ranges within ten years [Doc. 41 at ¶¶ 51, 52].

---

[6] Defendants state as an "undisputed" fact that TSU has the authority to set and implement its own compensation schedules without reference to those of other schools. Plaintiff admits that this is true "unless contracted otherwise," apparently arguing that TSU also has the ability to contractually obligate itself to tie its salaries to another school's [Doc. 41 at ¶ 56]. While that may be true, Plaintiff has shown no facts suggesting that TSU has in fact contracted to follow the pay schedules of any other school pursuant to the MOU or otherwise.

In April 2008, Plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging that "[t]he wages, salary, and . . . retirement benefits[] are systematically substantially lower for extension employees of [TSU] than the extension employees of [UT] of like position, years of service and experience, and education [Doc. 27-8].

## II. ANALYSIS

Plaintiff argues that the practice of paying CEP employees less than UT Extension employees is "racially based," and that equal pay is required under the MOU. The parties' dispute at this stage turns on two issues: first, whether Plaintiff has made out a prima facie case of discrimination, and second, whether Plaintiff has offered evidence that Defendants' proffered reason for setting the CEP pay schedules is pretextual.

### A. Standard of Review

Summary judgment is mandatory where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[7] A "material" fact is one that *matters*—i.e., a fact that, if found to be true, might "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The applicable substantive law provides the frame of reference to determine which facts are material. *Anderson*, 477 U.S. at 248. A "genuine" dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party. *Id.*; *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). In determining whether a dispute is "genuine," the

---

[7] Rule 56 was amended effective December 1, 2010, "to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56, Advisory Committee Note to 2010 Amendments. The 2010 amendments did not affect the standard for granting summary judgment, and earlier caselaw relating to that standard therefore remains good law. *Id.*

8

court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249. Instead, the court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports*, 253 F.3d at 907. A mere scintilla of evidence is not enough to survive a motion for summary judgment. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The moving party bears the initial burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. James*, 2011 WL 837179, *1 (M.D. Ga. 2011). The movant must support its assertion that a fact is not in dispute by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). If the moving party carries this burden, the opposing party must show that there is a genuine dispute by either "citing to [other] particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute. *Id.* In reply, the movant may then attempt to show that the materials cited by the nonmovant "do not establish the . . . presence of a genuine dispute." *Id.* Either party may also attempt to challenge the admissibility of its opponent's evidence.

The court is not required to consider materials other than those specifically cited by the parties, but may do so in its discretion. *Id.* If a party fails to support its assertion of fact or to respond to the other party's assertion of fact, the court may "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

9

### B. Prima Facie Case of Discrimination

Defendants argue that Plaintiff has not made out a prima facie case of discrimination because he is white, and he does not claim that he has been discriminated against because of *his* race. In other words, Defendants argue, Plaintiff has not shown himself to be a member of any protected class. Plaintiff responds that he is a member of a protected class because Defendants' racially motivated and discriminatory practice has caused him harm. The statute at issue provides, in relevant part:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's race*, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a) (emphasis added). The statute therefore would appear to require Plaintiff to allege and to prove that he has been discriminated against because of *his* race. As explained by the Supreme Court, Title VII discrimination occurs when a person is treated "in a manner which but for that person's [protected characteristic] would be different." *Newport News Shipbuilding & Dry Dock v. EEOC*, 462 U.S. 669, 683 (1983) (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 711 (1978)). A person may suffer unlawful discrimination even as compared to others who share his protected characteristic, but only if he is treated differently *because of* that protected characteristic. *See Olmstead v. L.C.*, 527 U.S. 581, 598 n.10 (1999). To be sure, whites are a protected group under Title VII, *Fuelling v. New Vision Med. Labs. LLC*, 284 F. App'x 247, 253 (6th Cir. 2008), but Plaintiff's allegations and proof fail to show that he was treated differently *because* he is white.

Because of this deficiency in his proof, Plaintiff has not shown *himself* to be the victim of

unlawful discrimination, whether under a "disparate treatment" or "disparate impact" theory. Title VII prohibits both the disparate treatment of identifiable persons and the disparate impact caused by the present application of past discriminatory decisions. *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2197-99 (2010); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971). A disparate treatment claim requires proof of discriminatory intent, but a disparate impact claim does not. *Lewis*, 130 S. Ct. at 2199. Both theories, however, must aim for the evil proscribed by the statute—an action which, either in intent or in operation, discriminate *on the basis* of a racial classification. *Griggs*, 401 U.S. at 431.

To prove the discriminatory intent required under the disparate treatment theory, a plaintiff may attempt to produce direct evidence of discriminatory intent, but such evidence is usually lacking, and indeed it is lacking here. *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Without direct evidence, the plaintiff must proceed under the familiar *McDonnell Douglas* burden-shifting framework, which requires the plaintiff to make out a prima facie case of discrimination. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). To make out his prima facie case, the plaintiff must show that he (1) is a member of the protected class (2) who was qualified for the position (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *Macy v. Hopkins County Sch. Bd. of Ed.*, 484 F.3d 357, 365 (6th Cir. 2007). This "circumstantial" showing is context-dependent, but it must allow the trier of fact to reasonably infer that a plaintiff's adverse treatment was motivated by the plaintiff-employee's protected characteristic, ordinarily by showing that the employer treated employees who lack that protected characteristic more favorably. *Id.* (collecting cases). Plaintiff has declined to make any showing that he was treated less favorably than non-white employees; indeed, such a showing would

11

tend to undermine his claim that he has been injured due to discrimination against non-whites.

The disparate treatment theory, therefore, does not seem to capture the essence of Plaintiff's allegations. Here, Plaintiff challenges a facially neutral policy (the practice of paying TSU employees less than UT employees, regardless of their individual races). Such a claim seems to fit more neatly into the disparate impact category. Disparate impact claims are the means for remedying "facially neutral" practices that "fall more harshly on one group than another." *Dunlap v. TVA*, 519 F.3d 626, 629 (6th Cir. 2008). Plaintiff's response to Defendants' motion for summary judgment does indeed raise this disparate impact theory [Doc. 40 at 7]. To prove disparate impact, a plaintiff must make out a prima facie case of discrimination by establishing, ordinarily with a "relevant statistical analysis," that "the challenged employment practice has an adverse impact *on a protected group*." *Dunlap*, 519 F.3d at 629 (emphasis added). Once again, however, Plaintiff has shown only that CEP employees are paid less than UT Extension employees, not that white employees are paid less than their non-white counterparts.

That Plaintiff has not shown *himself* to be the victim of unlawful discrimination, however, does not mean that there has been no unlawful discrimination. Title VII does not restrict its remedies to those who are directly victimized by their employers' unlawful practices. Instead, that statute allows a civil action to be brought by a "person claiming to be aggrieved" by an unlawful employment practice. 42 U.S.C. § 2000e-5(b), (g). Here, as noted, Plaintiff complains that he receives less pay because of a racially-based employment practice—that he, a white person, has been *collaterally* harmed by his employer's unlawful discrimination against a non-white minority. The Court assumes without deciding that Plaintiff is a "person claiming to be aggrieved" such that he may bring suit based on a "collateral injury" theory. *See Thompson v. N. Am. Stainless, LP*, 131 S.

Ct. 863, 870 (2011) (holding that a plaintiff within the "zone of interests" protected by Title VII may sue under the statute, and defining Title VII's zone of interests expansively: "to protect employees from their employers' unlawful actions").[8]

That Plaintiff may have a cause of action under Title VII, however, does not relieve him of the burden to show a genuine issue of fact regarding whether his injury was caused by some unlawful discrimination against his fellow employees. See *id.* In other words, Plaintiff must show facts sufficient to allow the trier of fact to conclude that he was injured due to Defendants' unlawful discrimination against another employee or employees. Here, Plaintiff's proof again falls short of creating a genuine issue of fact. Taking the material facts in the light most favorable to Plaintiff, he has shown only that CEP employees are paid less than UT Extension employees and that TSU is historically a minority university but UT is not.

Even assuming Plaintiff could qualify as a person aggrieved, the Court cannot conclude that these facts are sufficient to create a genuine issue with respect to whether non-whites have been treated differently or affected adversely because of race. Plaintiff cannot show a question of fact concerning disparate treatment because he has not identified a single non-white employee who has been paid a discriminatory wage, and he cannot show a question of fact concerning disparate impact because he has failed even to show the racial composition of the staffs of the respective universities, much less that TSU's salaries impact non-whites in a disproportionate manner. See *Bazemore v. Friday*, 478 U.S. 385 (1986) (finding a Title VII violation where an agricultural extension program

---

[8] In *Thompson*, the plaintiff's fiancé filed an EEOC charge with their mutual employer, and the plaintiff was fired. The Court held that the plaintiff could sue under Title VII for retaliation because, although his fiancé was technically the victim of the retaliation, he was "a person aggrieved" within the statute's zone of interests. *Id.* at 867, 870

13

failed to eliminate a "salary disparity between blacks and whites").

To conclude, Title VII prohibits racial discrimination; it does not mandate that all persons performing equal work receive equal pay. Plaintiff has simply not provided enough evidence to create a genuine issue of fact regarding whether he has suffered injury due to racial discrimination directed at him or anyone else.

### C. Legitimate Nondiscriminatory Reason

Despite the above analysis, the Court will entertain, for a moment, the viability of Plaintiff's core complaint—that TSU's failure to pay its extension agents salaries comparable to those paid by UT Extension, if otherwise unexplained, is sufficient to raise an inference that TSU's salary decisions were motivated by race. As explained above, this requires the assumption of facts not in evidence—namely, that TSU's salaries were set under circumstances indicating an intent to disadvantage non-whites. If such circumstances were present, the burden would shift to Defendants to articulate a legitimate, nondiscriminatory reason for its salary structure. *Chen*, 580 F.3d at 400. The ultimate burden of persuasion, however, would remain with Plaintiff to show that TSU's proffered reason is pretextual and the true motivation was discriminatory. *Id.* Defendants argue that the salaries for CEP employees were based on the prevailing market rates following the independent market study. In a confounding response, Plaintiff states only that "this is a jury decision" and "it is improper to argue that this is a basis for Summary Judgment." [Doc. 40 at 7-8]. The Court disagrees. There is a "jury question" only if a plaintiff carries his burden to show a genuine issue of fact regarding whether "the defendant's proffered explanation is pretextual." *See Whitfield v. State of Tenn.*, —F.3d—, 2011 WL 1085657, *6 (6th Cir. Mar. 25, 2011). Plaintiff has failed to do so here.

Defendants have submitted uncontradicted evidence that they set their pay schedules, effective in January 2007, on market rates.[9] Plaintiff's claim, however, rests on the existence of the "single, comprehensive extension program" created by the MOU and jointly administered by CEP and Extension UT. In Plaintiff's view, the co-executives of that program are obliged to pay their staffs comparable salaries, and their failure to do so can be explained only by racial motivations. Reading Plaintiff's argument generously, he appears to contend that any rationale for setting salaries, if it would contravene this purported obligation to pay CEP and UT Extension employees equally, would be impermissible, and therefore false, justifying an inference that race was the true motivation.

Fatally, however, Plaintiff has not shown that the MOU requires comparable pay. Plaintiff has his affidavit, which states his *belief* that the MOU requires as much, but Plaintiff's belief is immaterial. The MOU speaks for itself, and it does not contain a single provision requiring equal salaries.[10] *See Hartsel v. Keys*, 87 F.3d 795, 801-03 (6th Cir. 1996) (holding that subjective beliefs and intuitions could not create a triable issue of fact). TSU cannot set UT's salaries, nor can UT set TSU's salaries. Without a showing that there is an entity with the authority to set salaries for both

---

[9] The Court could have deemed those facts to be undisputed because of Plaintiff's failure to respond. *See* Fed. R. Civ. P. 56(c). The Court has independently reviewed the record, however, and has found no *evidence* in the record that TSU considered anything other than the market study in setting its salaries.

[10] There are only two mentions of county agent salaries in the MOU. The first is the provision which requires the "employing" university to pay any increase in salary accompanying an appointment to a county leadership position [Doc. 27-14 at ¶ 3]. Far from requiring equal salaries, this provision recognizes that an employee of one university does *not* become an employee of the other university merely by virtue of appointment to a position of joint responsibility over the shared aspects of the extension program. The second provision requires the schools to share in any budget cuts occasioned by a loss of county funding, taking into account the percentage of the affected employee's salary that was paid by the county [Doc. 27-14 at ¶ 9]. This provision simply requires that the *cuts* from a third-party funding source be shared equally; it does not require equality of the salaries from which those cuts are made.

TSU and UT employees, it is difficult to attribute any "discrimination" to Defendants or anyone else. Plaintiff points out that TSU has the ability to contract with another entity to make compensation decisions jointly [Doc. 41 at ¶ 56], but Plaintiff has shown no facts suggesting that TSU has in fact done so, pursuant to the MOU or otherwise. Any employer theoretically *could* agree with another employer to pay its employees equal salaries, but its failure to do, standing alone, cannot give rise to a claim under Title VII.

Consequently, because he has failed to establish a prima facie case of discrimination or to produce evidence that Defendants' proffered nondiscriminatory reason for its salary structure is pretextual, Plaintiff simply has not produced sufficient evidence to create a triable Title VII claim. Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's Title VII claim shall be **GRANTED**.

### D. Other Matters

Plaintiff's complaint also alleged violations of the Fair Labor Standards Act of 1938 ("FLSA") as amended by the Equal Pay Act of 1963 ("EPA"). Defendants' motion for summary judgment argues that they are entitled to sovereign immunity with respect to any FLSA claims and that Plaintiff, a male, has failed to state a claim under the EPA. Plaintiff did not respond to either argument. After review of the record, the Court finds that Defendants are entitled to summary judgment on these claims. First, Defendants argue correctly that they are immune from suit under the FLSA. Defendants are state entities protected by sovereign immunity. *See Boinapally v. UT.*, 23 F. App'x 512, 515 (6th Cir. 2001); *Boyd v. TSU*, 848 F. Supp. 111, 113 (M.D. Tenn. 1994). The

FLSA does not validly abrogate a state's sovereign immunity,[11] *Wilson-Jones v. Caviness*, 99 F.3d 203 (6th Cir. 1996) (amended on unrelated grounds on denial of rehearing, 107 F.3d 358 (6th Cir. 1997)), and the Court is not aware of any provision of Tennessee law waiving sovereign immunity for purposes of the FLSA, *see* Tenn. Code Ann. §§ 29-20-201(a), -202 to -207. Second, Defendants also argue correctly that the EPA is concerned only with gender-based discrimination, *see* 29 U.S.C. § 206(d)(1), and Plaintiff has not alleged or attempted to prove he has been paid less because of his gender.

### III. CONCLUSION

For the reasons above, Defendants' motion for summary judgment is **GRANTED** in all respects, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**. Finally, Defendants' motion in limine to exclude testimony by Plaintiff's expert [Doc. 32] is **DENIED AS MOOT**.

A separate judgment will enter.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[11] Sovereign immunity protects states from suits for money judgments but does not prevent a plaintiff from seeking prospective injunctive relief. See *Whitfield*, 2011 WL 1085657, at *2. Plaintiff's complaint, however, seeks only retrospective monetary relief [Doc. 1 at ¶¶ 23, 24].